☑ Original ❒ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

CLERK'S OFFICE
A TRUE COPY
Jul 08, 2026
s/ llc
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*
a pink iPhone in a clear case with dark trim ("Subject Phone 6"). This phone is currently located at the Milwaukee District Office, 4725 W. Electric Avenue, W. Milwaukee, Wisconsin.

Case No. 26-953M(NJ)

Matter No. 2023R00283

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To: Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the Eastern District of Wisconsin *(identify the person or describe the property to be searched and give its location)*:

Please see Attachment A-3.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

Please see Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before 7/22/2026 *(not to exceed 14 days)*

❒ in the daytime 6:00 a.m. to 10:00 p.m. ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to Honorable Nancy Joseph .
*(United States Magistrate Judge)*

❒ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

❒ for ____ days *(not to exceed 30)* ❒ until, the facts justifying, the later specific date of ____________ .

Date and time issued: 7/8/2026 @ 2:03 p.m. [signature: Nancy Joseph]
*Judge's signature*

City and state: Milwaukee, WI    Honorable Nancy Joseph, U.S. Magistrate Judge
*Printed name and title*

EXHIBIT
26-953M(NJ)
C

## Return

| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

## Certification

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: ____________________

____________________
*Executing officer's signature*

____________________
*Printed name and title*

## ATTACHMENT A-3

The property to be searched are described as a pink iPhone in a clear case with dark trim, hereinafter identified as "**Subject Phone 6**."

**Subject Phone 6** is currently located at the Milwaukee District Office, 4725 W. Electric Avenue, W. Milwaukee, Wisconsin.

This warrant authorizes the forensic examination of **Subject Phone 6** for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

1. All records on **the Subject Phones** as described in Attachments A-1 – A-6 that relate to violation of Title 21 U.S.C. § 841(a)(1) (distribution of and possession with intent to distribute controlled substances), 21 U.S.C. § 846 (conspiracy to distribute and possess with intent to distribute controlled substances), 21 U.S.C. § 843(b) (unlawful use of communications facilities), 18 U.S.C. § 922(g) (felon in possession of a firearm), 18 U.S.C. § 924(c) (possession of firearm in furtherance of drug trafficking), and 18 U.S.C. § 2 (aiding and abetting the aforementioned offenses), including but not limited to:

   a. lists of customers and related identifying information;

   b. types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

   c. any information related to co-conspirators and sources of drugs and firearms (including names, addresses, phone numbers, or any other identifying information);

   d. any information recording schedule or travel;

   e. all bank records, checks, credit card bills, account information, and other financial records;

   f. Photographs and/or videos depicting possession of drugs and/or firearms;

   g. Any evidence related to either the ownership, purchase, or possession of drugs and/or firearms;

   h. Records of Internet activity, including browser history, search terms that the user entered into any Internet search engine, and records of user-typed web addresses; and

   i. All data, communications, information, and records, in whatever form, that have any tendency to establish the actual or intended physical location of its user, or that of any of their associates involved in criminal activity, as well as the physical location of the **Phones**;

2. Evidence of user attribution showing who used or owned the **Phones** at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

As used above, the terms “records” and “information” include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

CLERK'S OFFICE
A TRUE COPY
Jul 08, 2026
s/ llc
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

a pink iPhone in a clear case with dark trim ("Subject Phone 6"). This phone is currently located at the Milwaukee District Office, 4725 W. Electric Avenue, W. Milwaukee, Wisconsin.

Case No. 26-953M(NJ)

Matter No. 2023R00283

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

Please see Attachment A-3.

located in the Eastern District of Wisconsin, there is now concealed *(identify the person or describe the property to be seized)*:

Please see Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ❒ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ❒ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. §§§ 841(a)(1), 846, 843(b); 18 U.S.C. §§§ 922(g), 924(c), 2 | distribution of and possession with intent to distribute controlled substances, conspiracy to distribute and possess with intent to distribute controlled substances, unlawful use of communications facilities; felon in possession of a firearm, possession of firearm in furtherance of drug trafficking, aiding and abetting the aforementioned offenses |

The application is based on these facts:

Please see Affidavit.

☑ Continued on the attached sheet.

❒ Delayed notice of ______ days *(give exact ending date if more than 30 days:* __________ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

KOSTANDEAN KAZAMIAS Digitally signed by KOSTANDEAN KAZAMIAS Date: 2026.07.07 09:50:24 -05'00'

*Applicant's signature*

Kostandean P. Kazamias, Special Agent - DEA

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone *(specify reliable electronic means)*.

Date: 7/8/2026

*Judge's signature*

City and state: Milwaukee, WI

Honorable Nancy Joseph, U.S. Magistrate Judge

*Printed name and title*

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR WARRANTS TO SEARCH

I, Kostandean P. Kazamias, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property— electronic devices—which are currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2. I am a Special Agent with the Drug Enforcement Administration (DEA) and have been so employed since 2020. I am currently assigned to the Milwaukee District Office, Group 62. My duties include the investigation of drug trafficking organizations and violations of federal narcotics and money laundering laws, including, but not limited to offenses defined by 21 U.S.C. §§ 841, 843, and 846, and 18 U.S.C. §§ 1956 and 1957. I am an investigative or law enforcement officer within the meaning of Section 2510(7) of Title 18, United States Code; that is, an officer of the United States who is empowered by law to conduct investigations and to make arrests for offenses enumerated in Title 18, United States Code, and Section 2516.

3. I have received training in the area of narcotics investigations, money laundering, financial investigations, and various methods that drug dealers use in an effort to conceal and launder the proceeds of their illicit drug trafficking enterprises. I

have participated in numerous investigations involving violations of state and federal narcotics laws. I have experience in the investigation, apprehension, and prosecution of individuals involved in federal criminal offenses, the use of cellular devices to commit those offenses, and the available technology that can be used by law enforcement to assist in identifying the users of cellular devices.

4. I have aided and participated in investigations that have led to the issuance of numerous search warrants involving violations of both state and federal narcotic laws. These warrants involved the search of locations including: residences of targets, their associates, and relatives, "stash houses" (houses used as drug/money storage locations), storage facilities, bank safe deposit boxes, cellular/camera phones, and computers. Evidence searched for and recovered in these locations has included controlled substances, firearms which I know to be tools of the drug trade, records pertaining to the expenditures and profits realized therefrom, monetary instruments, cellular phones, and various assets that were purchased with the proceeds of the drug trafficking.

5. Based on my training, experience, and conversations with other law enforcement officers (LEOs), I am familiar with the ways in which drug traffickers conduct their unlawful drug trafficking activity, including, but not limited to, their methods used to distribute, transport, store, manufacture, and import controlled substances, their use of code words and numbers to conduct their transactions, their methods for concealing and safeguarding narcotics and narcotics proceeds, their methods used to launder narcotics proceeds, their use of violence and threats of violence to protect their organization, and the methods employed by major narcotics

organizations to thwart any investigation of their illegal activities. For example, I am familiar with their use of telephones, counter-surveillance, false and/or fictitious identities, and the use of coded language during conversations when referring to narcotics to disguise the true meaning of the conversation.

6. Based upon my training and experience, I know that computer hardware and software may be important to a criminal investigation in two distinct and important respects: (1) the objects themselves may be instrumentalities, fruits, or evidence of crime, and/or (2) the objects may have been used to collect and store information about crimes (in the form of electronic data). Rule 41 of the Federal Rules of Criminal Procedure permits the government to search and seize computer hardware and software that are (1) instrumentalities, fruits, or evidence of crime, or (2) storage devices for information about crime.

7. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other case agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

8. Throughout this affidavit, reference will be made to case agents or officers. Case agents or officers are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your Affiant has had regular contact regarding this investigation.

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

9. The properties to be searched are described as follows:

a. an iPhone in a dark case, hereinafter identified as "**Subject Phone 1**";

b. a dark grey iPhone, hereinafter identified as "**Subject Phone 2**";

c. an iPhone in purple case with a heart, hereinafter identified as "**Subject Phone 3**";

d. a white iPhone, hereinafter identified as "**Subject Phone 4**";

e. a white iPhone in a black case, hereinafter identified as "**Subject Phone 5**";

f. a pink iPhone in a clear case with dark trim, hereinafter identified as "**Subject Phone 6**";

g. a dark grey iPhone, hereinafter identified as "**Subject Phone 7**";

h. a dark grey iPhone, hereinafter identified as **"Subject Phone 8"**; and

i. a dark grey iPhone in a clear case with black trim, hereinafter identified as the "**Subject Phone 9**," collectively **"the Subject Phones**.

10. I make this affidavit in support of an application to search **the Subject Phones** for evidence of violations of 21 U.S.C. § 841(a)(l) (distribution of controlled substances), 21 U.S.C. § 846 (conspiracy to distribute controlled substances), 21 U.S.C. § 843(b) (unlawful use of communications facilities), 18 U.S.C. §922(g) (felon in possession of a firearm), 924(c) (possession of firearm in furtherance of drug trafficking), and 18 U.S.C. § 2 (aiding and abetting the aforementioned offenses), collectively referred to hereinafter as the Target Offenses.

11. **Subject Phones 1**, **2**, and **3** are currently located at North Central HIDTA, 11548 West Theo Trecker Way, West Allis, Wisconsin. **Subject Phones 4** through **9** are

currently located at the Milwaukee District Office, 4725 W. Electric Avenue, W. Milwaukee, Wisconsin.

12. The applied-for warrant would authorize the forensic examination of **the Subject Phones** for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

### Summary

13. The Drug Enforcement Administration (DEA) has investigated the drug trafficking activities of a multi-state Drug Trafficking Organization (DTO). Throughout the investigation case agents identified multiple individuals believed to be involved in supplying multi-kilogram quantities of controlled substances to Milwaukee, Wisconsin, and other areas. Evidence gathered during this investigation reflects that Cornel C. CARNEGIE and Marcel D. OXLEY SR. (OXLEY SR.) are believed to be responsible for, and coordinating the movement of, multi-kilogram quantities of controlled substances from California to the Milwaukee, Wisconsin area as well as other areas. The evidence further reflects that Marcel D. OXLEY JR. (OXLEY SR.'s son), Vincent NICHOLSON JR., Stephen REESE, Anthony WILKS, Kristen CENDEJAS, and others worked with OXLEY SR. and CARNEGIE to facilitate the movement of controlled substances to Milwaukee, and store-controlled substances at various stash locations in Milwaukee, Wisconsin. Case agents have discovered that at least some of the controlled substances were transported via commercial airlines from California to Chicago, Illinois, and then to Milwaukee, Wisconsin, by vehicle. Case agents further believe that the OXLEY DTO then distributed

at least some of the controlled substances to Anthony T. WILKS at Jack's Executive Bistro located in Milwaukee, Wisconsin.

14. More specifically, the evidence reveals that DTO members smuggled kilogram quantities of controlled substances on commercial airlines from Los Angeles International Airport (LAX) to Chicago O'Hare International Airport (ORD) by using airport employee(s) to assist the DTO. Specifically, case agents believe that LAX airport custodian REESE used his access to the airport to bring controlled substances into LAX. Once another DTO member passed through airport security, the airport employee and the DTO member then met at a pre-determined location to switch backpacks. Subsequently, the DTO member who received the backpack containing the controlled substances departed LAX and landed at ORD. Once in Chicago, agents believe that DTO members transported the controlled substances to the Milwaukee, Wisconsin, area via vehicle for distribution. Case agents further believe that, in much the same fashion, the DTO used commercial airlines from ORD to LAX to facilitate the movement of drug proceeds in the form of bulk U.S. currency. To accomplish this, case agents believe that the DTO was assisted by TSA agent(s), who transported the drug proceeds into the airport to bypass security. Once through security, case agents believe the TSA agent(s) met with DTO members who had already gone through security. The DTO member and the TSA agent then swapped backpacks, and the DTO member subsequently transported the drug proceeds to California.

15. The investigation has included traditional law enforcement methods, including, but not limited to, interviews with confidential sources/source of information,

a controlled purchase of controlled substances, information from other law enforcement officers, documentary evidence, telephone toll data, pen register, trap and trace information, telephone subscriber information, physical and electronic surveillance, surveillance video, and search warrants.

**Charges**

16. On June 2, 2026, a grand jury sitting in the Eastern District of Wisconsin returned a four-count indictment against the Defendants. Count 1 alleges that the Defendants engaged in a conspiracy to distribute and possess with intent to distribute controlled substances beginning by at least December 18, 2022, and continuing until April 16, 2025, in violation of Title 21, United States Code, Sections 846, 841(a)(1), and 841(b)(1)(A), and Title 18, United States Code, Section 2(a). Count Two charges Anthony Wilks with distribution of a controlled substance, in violation of Title 21, United States Code, Section 841(a)(1) and 841(b)(1)(C). Count Three charges Marcel Oxley, Sr. and Marcel Oxley, Jr. with possessing a firearm in furtherance of a drug trafficking crime, in violation of Title 18, United States Code, Sections 924(c)(1)(A)(i), and Title 18, United States Code, Section 2(a). Finally, Count Four charges Marcel Oxley, Sr. with possession of a firearm as a prohibited person, in violation of Title 18, United States Code, Sections 922(g)(1) and 924(a)(8).

17. Arrest warrants for the charged defendants subsequently issued pursuant to the Indictment.

## Movement of Controlled Substances via Commercial Airlines

18. Phone records, flight records, and airport surveillance footage led agents to believe that Stephen M. REESE, an employee at the LAX airport, assisted the DTO by bringing suspected controlled substances into LAX and through security. As an employee at LAX, REESE is not required to go through security. Once beyond security checkpoints, REESE would provide a bag containing controlled substances to another member of the DTO who then flew to various locations throughout the United States.

19. Based on evidence gathered during the investigation, agents believe that the DTO smuggled drugs into LAX (with REESE's assistance) beginning by at least December 18, 2022, through May 23, 2024. Records reflect consistent suspected smuggling events, with them occurring multiple times per month.

20. As detailed below, on June 4, 2024, case agents intercepted approximately 10 kilograms of cocaine from a courier, Michelle CARTER, after it was provided to her by REESE at LAX. Case agents then obtained a search warrant for REESE's iCloud content which revealed numerous other instances of communications with CARNEGIE and OXLEY SR. in conjunction with flights by other DTO members including Marcel OXLEY JR. and Kristen CENDEJAS. Case agents reviewed additional airport surveillance that coincided with these communications. The cocaine seizure is described immediately below and other instances of airport surveillance in conjunction with recovered communications follow.

## June 2024 10 Kilogram Cocaine Seizure

21. During the morning hours of June 4, 2024, court-authorized location data for one of OXLEY SR.'s phone numbers, (310) 760-1161 (the 1161 Phone), and CARTER's phone revealed both traveled from Milwaukee to the area of ORD, seemingly together. At approximately 6:32 a.m., OXLEY SR.'s 1161 Phone was in the vicinity of ORD. At approximately 6:38 a.m., CARTER's phone was in the vicinity of ORD. As time passed, OXLEY SR.'s 1161 Phone traveled northbound to Milwaukee while CARTER's phone remained at ORD. Therefore, case agents believed OXLEY SR. drove CARTER to ORD so she could take a flight while he returned to Milwaukee.

22. Flight records and location data for CARTER's phone revealed CARTER, after a brief layover at the Salt Lake City International Airport, flew into the Long Beach (CA) Airport at approximately 2:07 p.m.

23. Case agents contacted American Airlines and were advised that CARTER had a reservation to depart on American Airlines flight 1564, LAX – (ORD) – Pittsburg (PIT), with a delayed departure time of 1:12 a.m. (which would be on June 5, 2024), from Terminal 5, gate 53A.

24. Case agents also contacted Los Angeles World Airport (LAWA) Badging office, who advised that REESE had used his LAWA-issued badge to enter through Los Angeles World Airport doors that lead to the Terminal 6 departure level. However, REESE was supposed to be on a day off from his work shift at LAX.

25. Case agents reviewed surveillance footage from within LAX and observed the following:

a. At approximately 9:03 p.m. PST, REESE was in the area of elevator T6-9, lower-level/tunnel area. REESE was observed to be in possession of a black colored backpack and sat near the area of Gate 67.

b. At approximately 9:10 p.m. PST, CARTER completed the Transportation Security Administration (TSA) screening process. CARTER was in possession of a black colored “SwissGear” Scan Smart TSA laptop backpack.

c. At approximately 9:14 p.m. PST, case agents observed CARTER reach the area of elevator T6-9. REESE, while in possession of the dark colored backpack, appeared to see CARTER near the elevator, then walked through a door that leads to the lower-level/tunnel area. Approximately a few seconds later, CARTER walked into elevator T6-9, which also leads to the lower level/tunnel area.

d. At approximately 9:16 p.m. PST, REESE took the escalator from the lower-level tunnel area to the departure level. REESE was then observed walking northbound through the departure level and eventually exited the terminal and walked to the area of the LAX parking structure P5/P6. Surveillance footage captured that REESE was in possession of a similar backpack (black colored “SwissGear” Scan Smart TSA Laptop backpack) as CARTER’s. Based on the zipper configuration on the backpack it appeared to be the same backpack CARTER possessed before meeting with REESE in the lower level / tunnel area.

e. At approximately 9:16 p.m. PST, CARTER walked from the same area where REESE took the escalator, lower-level / tunnel area. Surveillance footage captured CARTER’s black colored “SwissGear” Scan Smart TSA Laptop backpack, which appeared to be different than before meeting REESE. It appeared to case agents that the backpack was now weighed down and the zipper configuration was not the same.

26. Based on their familiarity with this investigation, case agents believed REESE and CARTER exchanged backpacks.

27. At approximately 11:20 p.m. PST, case agents responded to Terminal 5, Gate 53, to locate CARTER before her departure flight. Case agents located CARTER

laying down on the ground behind the American Airlines ticket counter near Gate 53A. Case agents then observed what appeared to be the same black "Swiss Gear" backpack from surveillance footage, which was sitting on the ground, approximately 6 inches away from CARTER. No other passengers were in the immediate area of the backpack.

28. At approximately 11:48 p.m. PST, case agents exposed narcotic detection K-9 "Casey" to the general area where CARTER was laying down. Case agents advised that K-9 "Casey" had alerted to the black "Swiss Gear" backpack sitting next to CARTER.

29. After walking CARTER to the LAXNTF office, CARTER verbally agreed and signed a DEA Consent Form giving case agents consent to search her bags. Case agents searched the black "Swiss Gear" backpack. Case agents opened the main compartment of the backpack and discovered 10 kilogram-sized vacuum-sealed packages. Field testing revealed that the white powdery substance tested positive for Cocaine Hydrochloride, weighing 11.76 kilograms (including the packaging).

**Source of Information**

30. Over the course of the investigation case agents had multiple proffer interviews with Source of Information (SOI) #10.[1] During these interviews, SOI #10 provided case agents with information regarding OXLEY DTO. SOI #10 stated that SOI #10 met OXLEY SR. in approximately December of 2022. SOI# 10 stated that SOI #10's

---

[redacted]

initial involvement with the OXLEY DTO was to obtain money orders to pay rent for various properties used by the DTO.

31. SOI #10 positively identified multiple members of the DTO, including OXLEY SR. as “Doug,” OXLEY JR. as OXLEY SR.’s son, CARNEGIE as “Ace,” Vincent NICHOLSON JR as “Slim” or “New York,” Christian FRAZIER as “Bubba,” Anthony WILKS as “the owner of Jack’s Executive Bistro,” and REESE as the “airport employee at LAX.”

32. SOI #10 stated that SOI #10 has taken approximately ten trips, mostly from ORD to LAX on behalf of the OXLEY DTO. SOI #10 stated SOI #10 typically transported what s/he believed to be U.S. currency in Swiss brand backpacks. SOI #10 stated that on approximately 2-3 occasions SOI #10 transported black Swiss brand backpacks from LAX to ORD. During these trips, SOI #10 reported a meeting with an LAX airport worker and was directed to a blind spot by an elevator once SOI #10 was through security checkpoint. When SOI #10 met with the LAX airport worker, SOI #10 was on the phone with OXLEY SR. and heard OXLEY SR. talking to someone else on another phone. SOI #10 stated that the Swiss brand backpack SOI #10 brought through security had clothes in it and was exchanged for a much heavier bag, which was only that heavy when SOI #10 flew from LAX to ORD.

33. SOI #10 said that on one occasion while in Los Angeles, SOI #10 was at an apartment with an individual s/he knew as “Ace.” (Case agents later showed a photograph of CARNEGIE to SOI #10, and s/he positively identified CARNEGIE as “Ace.”) In SOI #10’s presence, CARNEGIE called an individual and asked that

individual where he was. That individual arrived in a dark colored vehicle; CARNEGIE got out of the vehicle, retrieved a backpack from the rear of his vehicle and walked back to the other vehicle where he remained for about two minutes before returning to his vehicle with a backpack in hand and places into the rear of his vehicle. CARNEGIE then drove SOI #10 to LAX Airport. SOI #10 then stated s/he exited the vehicle driven by CARNEGIE and took the backpack that CARNEGIE had placed into the rear of his vehicle into the Airport passing TSA security. Once SOI #10 passed the security checkpoints with the empty backpack, SOI #10 met with an airport employee believed to be Stephen REESE and the two swapped backpacks. SOI #10 believes the date of this was [redacted]

34. Additionally, SOI# 10 told case agents that on numerous occasions in the past, s/he has been to a bar with OXLEY SR. in the Milwaukee, WI area. SOI# 10 stated that while at the bar, OXLEY SR. would meet a light skin black male, who owned the bar, and conduct business in the back room of the establishment. SOI #10 believes that OXLEY SR. met with this light skin black male believed to be the owner of the bar Anthony WILKS to sell him possibly marijuana. SOI #10 advised that these meetings happened approximately 3-4 times where SOI #10 was present where either OXLEY SR. or one of his associates carried in a backpack and met with WILKS. SOI# 10 stated that this bar was in the area of 48th Street and Villard across the street from a Citgo Gas Station. Based on SOI# 10's description of the location, case agents believed the bar SOI# 10 was referring to was Jack's Executive Bistro. Case agents displayed a photo of WILKS to SOI #10, who SOI #10 identified as the owner of Jack's Executive Bistro. Case agents also

displayed a photograph of Jack's Executive Bistro, and SOI #10 identified this as the bar where OXLEY SR. met with its owner.

**<u>CARNEGIE's and OXLEY SR.'s Involvement in the June 2024 Cocaine Seizure</u>**

35. Phone records reflect that throughout the evening of June 4 and into the early hours of June 5, 2024, REESE (using (323) 812-2879) had contact with CARNEGIE (using (669) 322-6506) and OXLEY SR. (using (424) 303-1049). Phone Number (669) 322-6506 was saved in SOI #10's phone as "Ace," a known nickname for CARNEGIE.

36. First, phone records reflect that at approximately 8:05 and 8:06 p.m., CARNEGIE called REESE. Beginning at 8:52 p.m., REESE called CARNEGIE three times, with the last call around 9:13 p.m.

37. An iCloud warrant for REESE's iCloud account reflected the following communications on June 4:

| Time | From | To | Message |
|---|---|---|---|
| 6:13 pm | Reese | Carnegie | 👀 |
| 6:24 pm | Carnegie | Reese | Same time |
| 6:24 pm | Reese | Oxley Sr. | 👀 |
| 6:25 pm | Reese | Carnegie | Liked "Same time" |
| 6:36 pm | Oxley Sr. | Reese |  |
| 8:05 pm | Carnegie | Reese | 👀 |
| 8:22 pm | Reese | [2] | Here |

[2] The iCloud return does not identify to whom REESE sent the messages at 8:22 p.m., 8:53 p.m., 10:02 p.m., and 10:16 p.m. However, based on the context, agents believe he sent it to CARNEGIE.

| | | | |
|---|---|---|---|
| 8:53 pm | Carnegie | Reese | In line still |
| 8:53 pm | Reese | | Ok |
| 9:02 pm | Carnegie | Reese | Just got to the front now |
| 9:02 pm | Reese | | Ok |
| 9:12 pm | Carnegie | Reese | Thru[3] |
| 9:16 pm | Reese | | ✔ |
| 9:16 pm | Carnegie | Reese | Liked "✔" |

38. Then, on June 5 at approximately 4:57 a.m. and 5:02 a.m., Oxley SR. called REESE via WhatsApp, likely to inquire about the narcotics transactions the previous evening. REESE appeared to call OXLEY SR. via WhatsApp later that day, at approximately 8:41 a.m.

**OXLEY JR. and REESE Switch Bags at LAX on May 12, 2024**

39. The investigation has revealed that OXLEY JR. assisted in transporting controlled substances and drug proceeds for the DTO.

40. As an example, on May 12, 2024, OXLEY JR. had a scheduled flight with United Airlines from LAX to Denver, with a connecting flight to the New Orleans International Airport.

41. Case agents reviewed footage from LAX on May 12, 2024. All times listed for the following events are in Pacific Standard time. At approximately 3:53 a.m., REESE

[3] Note: This is within minutes of when surveillance footage depicts CARTER clearing security.

entered a door in Terminal 6 baggage claim area, which leads to the sterile area of the airport operations area. Employees' bags are not screened by TSA when entering through the door that REESE entered. REESE was wearing a dark hat with an "LA" emblem, a jacket, and pants. REESE appeared to be in possession of black "Swiss Gear" Scan Smart TSA Laptop style backpack. The backpack contained a distinct latch in the middle of the backpack. At approximately 3:56 a.m., REESE entered the Terminal 6 departure level through a different door. REESE walked and sat down in the departure area of gate 65, while still in possession of the backpack.

42. At approximately 4:10 a.m., OXLEY JR. completed the TSA security screening process at Terminal 7. OXLEY JR. was wearing a dark sweater and pants and was in possession of what appeared to be a black "Swiss Gear" 3258 Laptop style backpack. The backpack contained a distinct vertical grey strap with a latch, which ran along the bottom portion of the backpack. OXLEY JR. walked from Terminal 7 screening to Terminal 6, gate 65 area, which was the same area where REESE was sitting down. At approximately 4:25 a.m., it appeared to case agents that REESE saw OXLEY JR. walking towards his direction. REESE stood up and walked to elevator T6-9. Meanwhile, OXLEY JR. also walked towards the area of elevator T6-9 and appeared to briefly make eye contact with REESE who was waiting for the elevator doors to open. REESE entered the elevator, and OXLEY JR. took the escalator to the lower-level arrivals / tunnel area. At approximately 4:26 a.m., OXLEY JR. arrived at the lower-level arrivals / tunnel area. At approximately 4:27 a.m., REESE walked away from the lower-level arrivals / tunnel area

and northbound through an employee/passenger exit tunnel that leads to the arrivals / baggage claim area.

43. At approximately 4:27 a.m., REESE continued walking northbound through an employee/passenger exit tunnel. REESE appeared to now be in possession of a black "Swiss Gear" 3258 Laptop style backpack with a distinct vertical grey strap with a latch, which ran along the bottom portion of the backpack. This is the same style backpack that was possessed by OXLEY JR. shortly before meeting with REESE in the area of the lower level / tunnel area. At approximately 4:28 a.m., OXLEY JR. took the escalator from the lower level to departure level. OXLEY JR. then walked northbound through the terminal. Surveillance footage captured OXLEY JR. in possession of a "Swiss Gear" Scan Smart TSA Laptop backpack. This is the same style backpack that was possessed by REESE shortly before meeting with OXLEY JR. at the lower-level arrivals / tunnel area. OXLEY JR. walked through Terminal 6 to Terminal 7 departure area. OXLEY JR. briefly entered a restroom and then walked to a departure gate (75B) where he entered the jet way to take a United Airlines flight to Denver, CO.

44. Based on their training, experience, and familiarity with this investigation, case agents believe that REESE smuggled illegal controlled substances in his backpack past security at LAX, while OXLEY JR. carried a similar backpack not containing controlled substances through security. Case agents believe that once REESE was in the sterile area of the airport with the illegal controlled substances, REESE met with OXLEY JR. and subsequently gave the backpack containing the illegal controlled substances to OXLEY JR. and that OXLEY JR. gave REESE the sterile backpack before his scheduled

flight. Case agents believe that OXLEY JR. subsequently boarded his flight and transported the illegal controlled substances.

**<u>May 13, 2024, CENDEJAS Flight</u>**

45. CENDEJAS also met with REESE to obtain drug-laden backpacks, which she then flew to other areas of the country.

46. Case agents discovered that on May 13, 2024, CENDEJAS had a scheduled flight on May 13, 2024, United Airlines #1339, from LAX to Denver, with a connecting flight to Nashville International Airport. Case agents reviewed REESE's ACAMS door badge swipe activity for that day which reflected that REESE was using his ACAMS door badge at LAX on that day. Additionally, case agents reviewed REESE's work schedule, which reflected that REESE was not scheduled to work on this day.

47. Case agents obtained and reviewed footage from LAX on May 13, 2024. All times listed for the following events are in Pacific Standard time. At approximately 3:49:08 a.m., REESE entered through terminal 6 baggage claim area and leads to the sterile area of the airport operations area. He nor his bags was screened by TSA when entering through this ACAMS door. REESE was in possession of a black backpack. At approximately 3:52:45 a.m., REESE entered Terminal 6 departure level and walked to the area of gate 65 and sat down. At approximately 4:13:00 a.m., CENDEJAS was in line for the TSA security screening process. CENDEJAS was wearing a white long sleeve blouse, dark pants & shoes and in possession of a dark jacket, suitcase w/ red neck pillow and backpack. At approximately 4:20 a.m., CENDEJAS placed her dark suitcase and what appeared to be a black "Swiss Gear" Scan Smart TSA Laptop style backpack on the TSA

screening tray. CENDEJAS and her bags then completed the TSA screening process. CENDEJAS then walked to gate 65, which was the area where REESE was sitting down. At approximately 4:25:30 a.m., REESE stood up once he saw CENDEJAS. CENDEJAS followed REESE to elevator T6-9. Case agents believe the DTO has utilized this location in the past due to the positioning of the cameras and/or lack of cameras and therefore, less of a chance, their illegal activities would be captured and detected by law enforcement. Seconds later, both REESE and CENDEJAS entered the elevator together. At approximately 4:27 a.m., CENDEJAS exited the elevator and walked towards a restroom in the area of gate 65. CENDEJAS was still in possession of her suitcase and black "Swiss Gear" backpack. After approximately one minute, CENDEJAS exited the restroom and walked northbound through terminal 6 and on to Terminal 7, gate 71B. At approximately 4:35 a.m., CENDEJAS entered the jet way and boarded a United Airlines flight to Denver, CO. Meanwhile, at approximately 4:29 a.m., REESE exited the sterile area of the airport and walked to parking structure 6.

48. Case agents believe that on May 13, 2024, REESE smuggled illegal controlled substances past security at LAX. Once REESE was in the sterile area of the airport with the backpack containing illegal controlled substances, REESE met with CENDEJAS and provided CENDEJAS with the bag containing the controlled substances. CENDEJAS simultaneously gave REESE the bag which did not contain illegal controlled substances. Case agents believe that CENDEJAS subsequently boarded her flight and transported the illegal controlled substances she obtained from REESE.

49. The iCloud warrant for REESE's iCloud account reflected the following communications during the suspected drug transfer. Note, OXLEY SR. is believed to have been saved as "The Mr. Unkutt" (saved in SOI #10's phone as "D F"); "REESE is believed to be the "Cleaning Man (owner)"; and CARNEGIE remained the user of (669) 322-6506:

| | | |
|---|---|---|
| 5/12/2024 2:15:07 PM(UTC-7) | **From:** 14243031049@s.whatsapp.net The Mr. Unkutt<br>**Participants:** 13238122879@s.whatsapp.net Cleaning Man (owner) | [illegible] |
| 5/12/2024 3:57:18 PM(UTC-7) | **From:** 16693226506<br><br>**To:** Recipient: 13238122879 Stephen Reese (owner) | 👀 |
| 5/12/2024 3:57:25 PM(UTC-7) | **From:** 16693226506<br><br>**To:** Recipient: 13238122879 Stephen Reese (owner) | 0 |
| 5/12/2024 4:01:50 PM(UTC-7) | **From:** 13238122879 Stephen Reese (owner)<br><br>**To:** Recipient: 16693226506 | Ok |

| | | |
|---|---|---|
| 5/13/2024 4:30:26 AM(UTC-7) | **From:** 14243031049@s.whatsapp.net The Mr. Unkutt<br>**Participants:** 13238122879@s.whatsapp.net Cleaning Man (owner) | 💪💪 |
| 5/13/2024 5:12:42 AM(UTC-7) | **From:** 13238122879 Stephen Reese (owner)<br><br>**To:** Recipient: 16693226506 | 👀 |
| 5/13/2024 5:12:53 AM(UTC-7) | **From:** 13238122879 Stephen Reese (owner)<br><br>**To:** Recipient: 17604474257 | 👀 |
| 5/13/2024 5:27:32 AM(UTC-7) | **From:** 13238122879 Stephen Reese (owner)<br><br>**To:** Recipient: 17604474257 | ☑️ |

50. Based on their training and experience, case agents believe that REESE used the eyeball emojis to convey the message to be on the lookout, and he used the checkmark box to advise that the illegal controlled substances to have been transferred to one of the couriers using phone number (760) 447-4257. The timing of these messages in relation to REESE and CENDEJAS' meetup at LAX lead case agents to believe OXLEY SR. and CARNEGIE communicated with REESE to smuggle controlled substances into LAX and evade law enforcement detection.

**May 30, 2024, [redacted] Flight**

51. Case agents believe that on May 30, 2024, an individual identified as [redacted] met with REESE at LAX and switched bags. Case agents are aware that [redacted] was scheduled to take a flight to Chicago on that day. Case agents reviewed REESE's ACAMS door badge swipes for May 30, 2024, and discovered REESE utilized his ACAMS door

badge on that day. Additionally, a review of REESE's work schedule revealed that RESSE was not scheduled to work on May 30, 2024.

52. REESE waited for [redacted] in the usual area of gate 65. Once [redacted] arrived, they went in elevator T6-9 and are believed to have met in the blind spot on the lower level. Based on distinctions between the backpacks REESE and [redacted] were observed wearing to the meeting and what kind of backpack each walked away carrying, case agents believe they switched bags so that REESE could transfer the drugs to [redacted]

53. A subsequent review of REESE's iCloud account revealed the following conversation which occurred on May 30, 2024, between REESE and CARNEGIE at (669) 322-6506.

| | | |
|---|---|---|
| 5/30/2024 4:58:55 AM(UTC-7) | **From:** 16693226506<br><br>**To:** Recipient: 13238122879 Stephen Reese (owner) | In line |
| 5/30/2024 4:59:04 AM(UTC-7) | **From:** 13238122879 Stephen Reese (owner)<br><br>**To:** Recipient: 16693226506 | Bet |
| 5/30/2024 5:18:43 AM(UTC-7) | **From:** 16693226506<br><br>**To:** Recipient: 13238122879 Stephen Reese (owner) | They tripping on the ticket give a sec |
| 5/30/2024 5:19:17 AM(UTC-7) | **From:** 13238122879 Stephen Reese (owner)<br><br>**To:** Recipient: 16693226506 | Damn I have to go to a training I have to be there at 5 |
| 5/30/2024 5:23:33 AM(UTC-7) | **From:** 16693226506<br><br>**To:** Recipient: 13238122879 Stephen Reese (owner) | They fixing it now |
| 5/30/2024 5:38:10 AM(UTC-7) | **From:** 16693226506<br><br>**To:** Recipient: 13238122879 Stephen Reese (owner) | Thru |

54. Case agents suspect the above communication between CARNEGIE and REESE means the following: "In line" indicates that [redacted] is going through the TSA security checkpoint. "Bet" indicates that REESE is acknowledging CARNEGIE's message as if to say "OK." CARNEGIE then advised that [redacted] is having issues with Airport/TSA personnel about his plane ticket. "Thru" advises that [redacted] made it through security.

55. Based on their familiarity with the investigation, the LAX surveillance footage, and the text exchanges, case agents believe REESE smuggled illegal controlled substances past security and met with [redacted] to switch backpacks in LAX. Case agents believe [redacted] gave REESE a backpack which did not contain illegal controlled substances, and that REESE gave [redacted] his backpack which contained the illegal controlled substances. [redacted] subsequently took his flight and transported the illegal controlled substances to their destination, Milwaukee, WI.

**Bag Swap: April 10-11, 2024, and NICHOLSON JR. Surveillance in Milwaukee**

56. The following occurred on this date, in summary fashion. Between April 10 at 10:48 p.m. and 4:29 a.m., CARNEGIE and REESE sent text messages coordinating the series of events that led to REESE and CENDEJAS meeting in the blind spot of the T6-9 elevator. After they met, REESE sent a text message to CARNEGIE stating, "Done," which he usually did. At 5:08 a.m., OXLEY SR. (310) 760-1161 called CENDEJAS, likely to ensure she obtained the backpack from REESE. CENDEJAS flew LAX to ORD early that morning.

57. Based on GPS information and surveillance, on April 11, 2024, CARTER was dropped off at ORD by someone driving a gray Ford Explorer (WI Reg AMZ-7539). This Ford Explorer was registered to Tamara Montgomery and was observed being used by numerous members of the DTO. A GPS warrant was obtained, and agents tracked the vehicle during the investigation.

58. Once at ORD on April 11, 2024, at approximately 12:39 p.m., airport surveillance depicted CENDEJAS and CARTER enter the same women's bathroom. CENDEJAS was carrying a backpack. CARTER entered the bathroom with a black SwissGear backpack that appeared to be empty or contain minimal items. She exited carrying a black SwissGear backpack that was full upon her exit from the bathroom.

59. According to phone records, at the same time CARTER and CENDEJAS entered, CARTER called CENDEJAS. Around 1 p.m., NICHOLSON JR. (using (562) 253-6441)[4] called CARTER. Thirteen minutes later, CARTER called OXLEY SR. ((760) 447-4257). CARTER called CENDEJAS again around 1:24 p.m.

60. When CARTER exited ORD, she called NICHOLSON JR. (at 1:21 and 1:46 p.m.) At the time of her second call to NICHOLSON JR., the gray Ford Explorer entered arrivals at ORD. CARTER got into the Explorer, which dropped her off at her home in Milwaukee around 3:30 p.m. GPS tracking reflected that the Ford traveled to a DTO stash location at 4080 Lake Drive in St. Francis, and at approximately 4:20 p.m., agents observed NICHOLSON JR. walk from the vehicle to Apartment #15 carrying a black backpack.

[4] Nicholson Jr. provided this number to police during a traffic stop on February 1, 2024.

61. The method used by the DTO to smuggle drugs required consistent and repeated use of their phones to facilitate successful transfer of drugs. Case agents believe the **Phones** would retain records unless and until a user deletes them, and thus, it is likely the **Phones** would continue to reflect evidence of communications regarding smuggling events.

**Seizure of Drug Proceeds from OXLEY JR.**

62. During this investigation, drugs proceeds were believed to be seized from OXLEY JR. on at least 2 occasions, September 26, 2023, and February 27, 2025.

***a. September 26, 2023***

63. Earlier in the investigation, OXLEY JR. was involved in a money pickup, leading case agents to believe that OXLEY JR. also transports drug proceeds.

64. Based on their training and experience, case agents are aware that money brokers arrange for couriers operating throughout the United States to pick up drug proceeds from multiple drug trafficking organizations (DTOs). The drug proceeds are then transferred to other money couriers or deposited into bank accounts believed to be used by drug cartels to launder proceeds of drug sales. On occasion, a money laundering contract may include converting the bulk currency to cryptocurrency and transferring it to a cryptocurrency address provided by the money broker.

65. On September 26, 2023, case agents conducted an undercover (UC) money pickup in the Milwaukee, Wisconsin, area. During the money pickup, the OXLEY DTO delivered bulk U.S currency to an undercover (UC) in the Milwaukee, Wisconsin area. Surveillance units observed two vehicles arrive in the area of this money delivery. The

bulk U.S currency delivered totaled approximately $149,760. Case agents displayed a photo of OXLEY JR. to the UC, who the UC identified as the individual who gave him/her the approximate $149,760 U.S. currency.

66. In addition, it appeared to case agents conducting surveillance that the two vehicles that arrived were working in tandem. During the money pickup, case agents observed OXLEY JR. exit a grey Ford Explorer bearing WI Registration AM7-7539 and provide the UC with the $149,760 U.S. currency.

67. The second vehicle observed during the money pickup was a grey Jeep with Illinois (IL) Registration EA12637. Case agents conducted a query of the Department of Transportation and discovered EA12637 (IL) was registered to Routes Car Rental USA Inc., at 3901 Mannheim Road, Schiller Park, IL. Case agents administered a subpoena to Routes Car Rental, the results of which reflected the vehicle was rented by OXLEY SR. on September 17, 2023. Additionally, Routes Car Rental provided case agents with a surveillance camera photo of the individual who rented the vehicle at their location, and case agents positively identified this individual as OXLEY SR.

68. Based on case agents' training, experience, knowledge of the case, and the events that took place on September 26, 2023, case agents believe the $149,760 U.S. currency was illegal drug proceeds, and OXLEY SR. was involved in coordinated the movement of these proceeds.

***b. February 27, 2025***

69. On February 27, 2025, case agents conducted surveillance at 1826 N. 40th Street, Milwaukee, WI, a location believed to be used by the OXLEY DTO. Parked in front

of the residence was a Gold Town and Country Van bearing WI registration AYY6964. On numerous occasions in the past, case agents have observed this Town and Country van being used by members of the DTO.

70. At approximately 11:45 a.m., case agents observed OXLEY JR. exit the side door of the residence and enter the Town and Country van. Case agents then followed OXLEY JR. to the White Oaks Apartments, located at 9119 N. White Oak Lane, Bayside, WI. Case agents were unable to see if OXLEY JR. entered the apartment complex.

71. At approximately 1:03 p.m., case agents observed OXLEY JR. exit the apartment complex, carrying a duffle bag, and enter the Town and Country van. Case agents believed the DTO had an apartment at the White Oaks Apartment complex. Records from the apartment complex lead case agents to suspect that the DTO was using/occupying Apartment 218. In reviewing the information pertaining to apartment 218, case agents believe this apartment was leased using false identification. Based on case agents' familiarity with the investigation, case agents know that the OXLEY DTO has leased apartments in the past using false identification.

72. Case agents subsequently followed OXLEY JR. as he was driving towards Illinois. At approximately 1:59 p.m., OXLEY JR. made a short stop at a Navy Federal Bank located at 6447 Grand Avenue, Gurnee, IL. Shortly thereafter, OXLEY JR. continued driving through Illinois.

73. At approximately 2:41 p.m., the Illinois State Police, hereafter referred to as ISP, conducted a traffic stop, which led to the search of the Town and Country van on Lake Cook Road in Buffalo Grove, IL. Before the stop, ISP observed the Town and

Country van cross over the white dotted lines, travel at speeds above the posted limit, and ISP observed the driver not wearing a seatbelt. As ISP approached the Town and Country van, ISP smelled the odor of cannabis emitting from the vehicle. Additionally, as ISP contacted OXLEY JR. it was observed that OXLEY JR. was still not wearing a seatbelt. During the search, ISP located a duffle bag that contained U.S. currency, a firearm under the driver seat of the vehicle, and U.S. currency on OXLEY JR.'s person. Additionally, case agents located two cellular telephones in the vicinity of the center counsel of the Town and Country van. Case agents spoke to OXLEY JR. after reading him his constitutional rights. OXLEY JR. did not make any statements. The total sum of U.S. currency located in the duffle bag and on OXLEY JR.'s person was $42,815 in U.S. currency. At the conclusion of the stop, OXLEY JR. was given his firearm, as he had legal documentation for the firearm.

74. Case agents subsequently seized the two cellular telephones, as well as the U.S currency located in the duffle bag and on OXLEY JR.'s person. The duffle bag that contained the U.S currency appeared to be the same duffle bag case agents observed OXLEY JR. carrying when exiting the White Oaks Apartment complex earlier in the day.

75. Based on case agents' familiarity with the investigation, case agents believe OXLEY JR. was enroute to drop the money off on behalf of the OXLEY DTO. Case agents believe the $42,815 was suspected drug proceeds or debts owed for controlled substances.

76. On March 12, 2025, the Honorable William E. Duffin, United States Magistrate Judge for the Eastern District of Wisconsin, signed a federal search warrant authorizing the forensic examination of OXLEY JR.'s phones, which were seized during

the traffic stop on February 27, 2025. These phones were assigned telephone numbers (414) 242-8542 and (323) 542-9324.

77. An examination of OXLEY JR.'s phones revealed notes and messages consistent with drug activity. For example, located within the notes section of one of the phones is what case agents believe to be money and drug ledgers. As an example, a note dated February 24, 2025, at 12:58 a.m., was titled "33625." In this note, case agents observed the following figures, which were memorialized in three separate lines: "50, 33650, 34232", "45177, 34143, 33500, 11000", and "78,643." Additionally, case agents observed the note stated, "Lil D owe 1500", with "80,143 pose to be the total" written below. The note also stated: "Miggs brung 32,00." Case agents believe that "Lil D," and "Miggs," are controlled substances customers and that these amounts reflect drug debts owed and/or drug debts that have been paid to the OXLEY DTO.

78. In OXLEY JR.'s phone bearing (323) 542-9324, case agents observed messages with CARNGIE. For example, on March 18, 2023, CARNEGIE, using phone number (407) 307-7080, sent a message to OXLEY JR. which read, "This aktive." As detailed in this affidavit, case agents believe "aktive" is CARNEGIE. Additionally, on January 16, 2025, CARNEGIE, using phone number (407) 307-7080, sent OXLEY JR. a link from atmlax.com and a text message, which read, "Apply for the security."

79. Furthermore, on January 16, 2025, OXLEY SR., using (310) 760-1161, sent to OXLEY JR. and two other co-conspirators a link to atmlax.com, and stated "The krew [sic] can each apply for all positions they hiring." In a subsequent message, OXLEY JR. replied, "Aight im finna check it out."

80. Case agents visited atmlax.com. The company states that it provides multiple services at LAX, to include interline baggage, wheelchair, baggage handling, passenger security, and catering security services. Case agents believe CARNEGIE and OXLEY SR. sent these job postings to multiple members of the DTO. Case agents believe that the DTO was looking to recruit DTO members to obtain positions of employment at LAX to facilitate the DTO.

81. This leads case agents to believe CARNEGIE and OXLEY SR. were responsible for recruiting employees at LAX to help smuggle drugs into the sterile side of the airport.

**Evidence of Distribution at Jack's Bistro, Operated by WILKS**

82. Since at least July 2023, electronic surveillance has reflected that OXLEY SR. and members of the DTO go to Jack's Executive Bistro, which was owned and operated by WILKS, to meet with WILKS. Case agents further believe based on their training, experience, and familiarity with this investigation that in many instances, OXLEY SR. and members of the DTO were not at Jack's Executive Bistro to patronize the establishment. Rather, they were there to meet with WILKS to facilitate the DTO. In part, this belief is based on their visits that occur during hours in which Jack's Executive Bistro is not open to the public, the short duration of the visits, and the fact that they are observed carrying bags in/out of the Bistro. As of July 30, 2024, Jack's Executive Bistro was shut down by the city of Milwaukee due to numerous reports of violence and neighborhood complaints. Based on electronic surveillance at Jack's Executive Bistro, however, case

agents believe that WILKS was still using the establishment in furtherance of his drug trafficking activities after being shut down.

83. During the investigation, investigators observed the following DTO members at Jack's Executive Bistro engaging in activities that appeared to be consistent with drug trafficking: OXLEY SR., WILKS, NICHOLSON JR., FRAZIER, and OXLEY JR.

84. Additionally, a confidential source, informed agents that WILKS was a controlled substance distributor and subsequently purchased cocaine from WILKS at Jacks' Executive Bistro. On February 28, 2023, case agents met with a confidential source (CS), who informed case agents that the CS knew of an individual who goes by "ANT," later positively identified as Anthony T. WILKS, who distributes multi-kilogram quantities of cocaine, fentanyl, and marijuana in the Milwaukee, Wisconsin area. The CS stated that WILKS is a member of the "BGM," "Bosses Get Money." The CS stated that WILKS is known to store and distribute multi-kilogram quantities of cocaine, fentanyl, and marijuana at Jack's Executive Bistro, a bar restaurant at 4923 W. Villard Avenue in Milwaukee. The CS further stated that the CS has purchased approximately two kilograms of cocaine approximately three to four times from WILKS in the spring/summer of 2022 and paid approximately $23,000 per one kilogram of cocaine.

85. Beginning in January of 2023, the CS made statements against the CS' penal interests. The information provided by the CS is consistent with evidence gathered during the course of this investigation where the CS was not used, and much of the CS' information has been corroborated through independent investigation, including law enforcement records and telephone toll records, as well as a controlled purchase of

controlled substances. The CS is cooperating for consideration relating to law enforcement activity that exposes the CS to drug trafficking charges and firearm charges, which charges have not yet been filed or presented to a grand jury. The CS' criminal history includes convictions for conspiracy to possess with intent to distribute and to distribute cocaine, battery, resisting or obstructing an officer (3 counts), keeping a drug house, disorderly conduct, possession of marijuana (2nd offense), and escape. The CS also has juvenile convictions. Finally, the CS has had an adequate opportunity to directly observe the events discussed and/or has heard conversations directly from the individuals discussed herein. Within the context of the information detailed and relied upon for purposes of this affidavit, case agents believe the CS is credible and the CS's information reliable.

86. On or about August 24, 2023, under the direction and control of case agents, the CS arrived at Jack's Executive Bistro and purchased approximately 535 gross grams of cocaine for $10,000 U.S. currency from WILKS. The controlled buy occurred in a separate room inside Jack's Executive Bistro. After obtaining the cocaine from WILKS, which was located inside of a white Styrofoam container in a black bag, the CS gave the cocaine to case agents. Case agents sent the cocaine to DEA's North Central Laboratory for testing which revealed a positive indication for the presence of cocaine.[5]

---

[5] Based on my training and experience, I know a "controlled buy" is a law enforcement operation in which an informant purchases drugs from the target. The operation is conducted using surveillance, usually audio and video taping equipment, and pre-recorded purchase money. When an informant is used, he/she is searched for contraband, weapons, and money before the operation. The informant is also wired with a concealed body recorder and/or a monitoring device. When the transaction is completed, the informant meets case agents at a pre-determined meet location and gives the purchased drugs and the recording/monitoring equipment to the case agents. The informant is again searched for contraband,

**Search Warrant at 9119 N. White Oak Lane Unit 218**

87. On April 16, 2025, members of the Milwaukee County Sheriff's Office Civil Process Unit executed a court ordered eviction at 9119 N. Oak Lane, Unit 218, Bayside, Wisconsin. The name listed on the eviction and named tenant of the unit was "Capricia Robynson." As deputies began knocking and announcing their presence, OXLEY SR. let them into the residence. Upon entering the residence, a deputy immediately observed OXLEY SR. walk to a table in the living room area and place a hat over two firearms that were laying in plain view. OXLEY SR., who has previously been convicted of a felony punishable by more than one year, and therefore prohibited from possessing a firearm, stated that the weapons belonged to his son, who had a valid Concealed Carry Permit. Additionally, OXLEY SR. told law enforcement that he had been sleeping on the couch, which was in the direct vicinity of the two firearms. OXLEY SR. was the only individual present in the living room. Additionally, located within the residence was OXLEY JR and R.J. (x/x/2001). Based on the observation of firearms in plain view, deputies froze the scene and applied for a State of Wisconsin search warrant. On the same date, the Honorable Susan Roth, Circuit Court Commissioner, First Judicial District of Wisconsin, at Milwaukee, Wisconsin signed and authorized the search warrant.

88. During the search of the residence, case agents located bulk U.S. Currency on OXLEY SR.'s person and in the residence, which totaled approximately $84,396.00. Based on their training, experience, and knowledge of this investigation, case agents

---

weapons, and money and then interviewed by the case agents about the drug transaction. A sample of the suspected drugs is field tested by the case agents for the presence of controlled substances and then placed in inventory pursuant to normal inventory procedures.

believe the bulk U.S. Currency located on OXLEY SR.'s person and in the residence is suspected drug proceeds. Additionally, during the search, case agents located four firearms, a money counter, and ammunition. One of the firearms was located under the couch that OXLEY SR. said he was sleeping on. Case agents also located multiple cellular telephones and subsequently applied for and were granted authorization to search them.

89. One of the phones appears to have belonged to R.J. Case gents observed text messages that led case agents to believe R.J has been paid by the DTO to smuggle controlled substances on a commercial flight. Located in R.J.'s phone, was a text conversation with phone number 323-542-9324, saved as "Marcel." Case agents believe that this number belongs to OXLEY JR., as this is the same cellular telephone number which was seized from OXLEY JR. during the traffic stop.

90. OXLEY JR. and R.J. discussed R.J. being paid "500 to 1500" and "some pounds" to check a luggage under the plane. On April 14, 2025, OXLEY JR. texted R.J. stating, "I been out the way hustling it's not just tree that I got going out there this shii really like bmf." Based on their training and experience, case agents believe that OXLEY JR. was referring to his involvement in controlled substances trafficking on behalf of the OXLEY DTO. Case agents believe that it is common for drug traffickers to utilize the terminology "hustling," when referring to the sale of illegal controlled substances. Case agents believe "tree" was a reference to marijuana, so when OXLEY JR. stated, "it's not just tree," case agents believe that OXLEY JR. was indicating he was trafficking more than marijuana on behalf of the OXLEY DTO.

91. Case agents know that on April 11, 2025, OXLEY JR. and R.J took United Airlines flight # UA1843 from LAX to ORD.

**OXLEY SR. Phones**

92. Case agents further examined three phones that OXLEY SR. stated were his at the time of the search warrant execution (previously detailed).

93. While reviewing a phone, assigned cellular telephone number (310) 760-1161, case agents observed the conversation between OXLEY SR. and cellular telephone number (424) 378-8067, saved as "Spawn," believed to be used by Aurion OXLEY, OXLEY SR.'s daughter.

94. In a message thread from April 12 to 13, 2025, OXLEY SR. and Aurion OXLEY appear to be having a disagreement, with Aurion OXLEY threatening to expose OXLEY SR.'s drug activity to law enforcement. During this conversation, Aurion OXLEY stated, "I know that you sell drugs," "I hope them ppl keep snatching yo money," "Ima give da Feds a tip," and "You make Yo kids do yo dirty work send your son on trips all type of shit." OXLEY SR. calls his daughter a "rat" and says, "You know nothing about the power my mom have when it come to the spiritual world." Aurion OXLEY further states "U just had drugs in your house lastnight [sic]", "U was putting it in them suitcases," and "The ones that u gotta check in."

95. When Aurion OXLEY sent OXLEY SR, "I hope them ppl keep snatching yo money," case agents believe Aurion OXLEY was referring to the above-mentioned February 27, 2025, seizure from OXLEY JR during the traffic stop. Additionally, case agents believe that Aurion OXLEY accused OXLEY SR. of using his children to further

the controlled substances trafficking on behalf of the OXLEY DTO. ("You make Yo kids do yo dirty work send your son on trips all type of shit.") When Aurion OXLEY stated, "U was putting the, in them suitcase," case agents believe Aurion OXLEY was referring to R.J and OXLEY JR., as detailed above, and that R.J was paid to transport illegal controlled substances via a checked bag.

96. While reviewing a second phone, assigned number (415) 301-1337, case agents observed a conversation between OXLEY SR. and phone number (213) 887-3746, saved as "Diabla." On December of 2024, OXLEY SR. sent "Diabla" what appeared to be a link to a pill press.

97. Again, on March 10, 2025, it appeared to case agents that OXLEY SR. was communicating with "Diabla" in efforts to purchase a pill press again. "Diabla" asked "which one," and OXLEY SR. sent a link for a particular pill press.

98. While reviewing a third phone, assigned number (414) 207-5181, case agents observed a conversation between OXLEY SR. and cellular telephone number (414) 335-6882, saved as "Gigi Chunk." OXLEY SR. stated he wanted "Gigi Chunk" to "pick up the lil money," which appeared to be for rent. Then, on February 28, 2025, OXLEY SR. wrote "and I told you I wasn't letting you just take a loss either . . . and I need that car . . . my peeps jus got pulled over and they got 50k [] I'm sick aF." Additionally, OXLEY SR. stated, "The van good for local shit but not for that highway like that..jus a unnecessary loss." Case agents believe OXLEY SR. referenced the traffic stop and seizure of $42,81,5 which was seized from OXLEY JR. on February 27, 2025.

## Additional Source of Information – SOI #13

99. On May 17 and 19, 2026, case agents interviewed SOI #13. SOI #13 identified multiple individuals by photograph to include OXLEY SR., OXLEY JR., NICHOLSON JR., WILKS, and CENDEJAS.

100. SOI #13 stated that on approximately four separate occasions, SOI #13 has seen marijuana, ecstasy, and kilogram quantities of cocaine and/or methamphetamine in black backpacks SOI #13 believed to have originated from Los Angeles, California, via commercial airlines, to O'Hare International Airport. SOI #13 stated that SOI #13 believes this started approximately five years ago, 2021. SOI #13 stated that SOI #13 believes narcotics are transported in such fashion approximately one to two times a month and that five to ten kilograms of narcotics are transported on each occasion.

101. SOI #13 stated that approximately in December of 2025, SOI #13 observed multiple kilograms of cocaine at an apartment located on Locust near a police station in Milwaukee, Wisconsin. SOI #13 stated multiple individuals were at this apartment, including OXLEY SR. and OXLEY JR.

102. SOI #13 has made statements against SOI #13's penal interests. The information provided by SOI #13 is consistent with evidence gathered during the course of this investigation, and much of SOI #13's information has been corroborated through independent investigation such flight records, surveillance footage, electronic messages, and physical seizures of evidence. SOI #13 provided information to case agents for judicial consideration relating to pending state cases for felony and misdemeanor bail jumping, misdemeanor retail theft, misappropriate ID info -avoid penalty, resisting or

obstructing an officer, felony drug trafficking charges in multiple counties, misdemeanor possession of marijuana, and misdemeanor and felony drug possession. Within the context of the information detailed and relied upon for the purposes of this affidavit, case agents believe SOI #13 is credible and SOI #13's information reliable.

**Arrest of DTO Members**

103. On June 17, 2026, CARNEGIE, REESE, OXLEY JR., WILKS, and NICHOLSON JR. were arrested pursuant to arrest warrants issued in the Eastern District of Wisconsin and were and taken into federal custody.

104. On June 17, 2026, case agents observed WILKS exit a residence located at 3809 W. Fountain Avenue, Milwaukee, Wisconsin, and enter a vehicle. Subsequently, law enforcement officers conducted a traffic stop of the vehicle. WILKS was arrested. A search incident to arrest revealed two separate bags containing suspected fentanyl on WILKS' person. Both bags, each weighing approximately 32 gross grams, to include packaging, had a presumptive positive alert for the presence of fentanyl via the mobile detect field testing kit. During the search of the vehicle, case agents located **Subject Phones 1** through **3**.

105. On June 17, 2026, NICHOLSON JR. was arrested after arriving at the probation office located at 222 E. Javelina Avenue, Mesa, Arizona. Officers arrested and searched NICHOLSON JR. and located **Subject Phone 4** and **Subject Phone 5** on his person. NICHOLSON JR. has previously been convicted of a felony punishable by more than one year in prison.

106. On June 17, 2026, case agents conducted surveillance at 3873 S. Redondo Boulevard, Los Angeles, California. Case agents subsequently observed REESE exit the residence and depart the area using an electric bicycle. Shortly thereafter, the Los Angeles Airport Police initiated a traffic stop of REESE. Case agents arrested and searched REESE and located **Subject Phone 7** on his person.

107. On June 17, 2026, case agents conducted surveillance of OXLEY JR. OXLEY JR. was observed operating a white Ford pickup truck. Subsequently, the Los Angeles County Sheriff's Office conducted a traffic stop of OXLEY JR. Case agents conducted an inventory search of the vehicle and located **Subject Phone 8**.

108. On June 17, 2026, the Riverside County Sheriff's Department executed a search warrant at 12698 Softwind Drive, Moreno Valley, California. During the servicing of the warrant, multiple individuals exited the residence to include CARNEGIE. Case agents subsequently arrested and searched CARNEGIE and located **Subject Phone 9** on his person. CARNEGIE has previously been convicted of a felony punishable by more than one year in prison.

109. On June 18, 2026, CENDEJAS turned herself in and was subsequently arrested by case agents in Los Angeles, California. Pursuant to her arrest, case agents located **Subject Phone 6** on her person and seized the device.

110. **The Subject Phones** are currently in the lawful possession of the DEA. **Subject Phones 1**, **2**, and **3** are currently in storage at North Central HIDTA, 11548 West Theo Trecker Way, West Allis, Wisconsin. **Subject Phones 4** through **9** are currently in storage at the Milwaukee District Office, 4725 W. Electric Avenue, W. Milwaukee,

Wisconsin. In my training and experience, I know that **the Subject Phones** have been stored in a manner in which their contents are, to the extent material to this investigation, in substantially the same state as they were when **the Subject Phones** first came into the possession of the DEA.

111. Based on their training, experience, and knowledge of this investigation, case agents believe that **the Subject Phones** contains evidence of the Target Offenses.

## TECHNICAL TERMS

112. Based on my training and experience, I use the following technical terms to convey the following meanings:

a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen

for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments, or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. Tablet: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending, and receiving e-mail, and participating in Internet social networks.

g. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

h. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

113. Based on my training, experience, and research, I know that **the Subject Phones** have capabilities that allow them to serve as wireless telephones, digital cameras, portable media players, GPS navigation devices, and PDAs. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

114. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been

viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

115. There is probable cause to believe that things that were once stored on **the Subject Phones** may still be stored there, for at least the following reasons:

a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

116. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that

establishes how **the Subject Phones** were used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on **the Subject Phones** because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

117. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the **Phones** consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

118. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

119. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of **the Subject Phones** described in Attachments A-1 – A-6 to seek the items described in Attachment B.

120. This is part of an ongoing investigation into a multi-state DTO distributing fentanyl, cocaine, and other controlled substances in the southeast Wisconsin area. This investigation hopes to identify all of the local members, any out of state members, any out of country members, and the sources of supply of the controlled substances being brought into southeast Wisconsin. The investigation will continue until all appropriate law-enforcement investigative methods have been exhausted.

## ATTACHMENT A-3

The property to be searched are described as a pink iPhone in a clear case with dark trim, hereinafter identified as "**Subject Phone 6**."

**Subject Phone 6** is currently located at the Milwaukee District Office, 4725 W. Electric Avenue, W. Milwaukee, Wisconsin.

This warrant authorizes the forensic examination of **Subject Phone 6** for the purpose of identifying the electronically stored information described in Attachment B.

# ATTACHMENT B

1. All records on **the Subject Phones** as described in Attachments A-1 – A-6 that relate to violation of Title 21 U.S.C. § 841(a)(1) (distribution of and possession with intent to distribute controlled substances), 21 U.S.C. § 846 (conspiracy to distribute and possess with intent to distribute controlled substances), 21 U.S.C. § 843(b) (unlawful use of communications facilities), 18 U.S.C. § 922(g) (felon in possession of a firearm), 18 U.S.C. § 924(c) (possession of firearm in furtherance of drug trafficking), and 18 U.S.C. § 2 (aiding and abetting the aforementioned offenses), including but not limited to:

a. lists of customers and related identifying information;

b. types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

c. any information related to co-conspirators and sources of drugs and firearms (including names, addresses, phone numbers, or any other identifying information);

d. any information recording schedule or travel;

e. all bank records, checks, credit card bills, account information, and other financial records;

f. Photographs and/or videos depicting possession of drugs and/or firearms;

g. Any evidence related to either the ownership, purchase, or possession of drugs and/or firearms;

h. Records of Internet activity, including browser history, search terms that the user entered into any Internet search engine, and records of user-typed web addresses; and

i. All data, communications, information, and records, in whatever form, that have any tendency to establish the actual or intended physical location of its user, or that of any of their associates involved in criminal activity, as well as the physical location of the **Phones**;

2. Evidence of user attribution showing who used or owned the **Phones** at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

As used above, the terms “records” and “information” include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.